IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge R. Brooke Jackson

Civil Action No 15-cv-01140-RBJ

ESTATE OF TANYA MARTINEZ;
JUDY ARMIJO, as Personal Representative of the Estate of Tanya Martinez;
ESAI MARTINEZ, a minor, by and through his grandmother, Judy Armijo; and
ANGEL MARTINEZ,

      Plaintiffs,

v.

KIRK TAYLOR, in his official capacity as Pueblo County Sheriff;
CORRECTIONAL HEALTHCARE COMPANIES, INC.;
CORRECTIONAL HEALTHCARE PHYSICIANS, P.C.;
CORRECT CARE SOLUTIONS, LLC;
MIKE WHITE, E.M.T., in his individual and official capacities;
JENNIFER SCOTT, R.N., in her individual and official capacities;
KIM MURRAY, L.P.N., in her individual and official capacities;
NORMA MOWER, PA-C, in her individual and official capacities;
DEPUTY CINDY GOMEZ, in her individual and official capacities;
DEPUTY DEANA COOK, in her individual and official capacities; and
DEPUTY ANNADENE LUCERO, in her individual and official capacities,

      Defendants.

---

## ORDER

---

This matter is before the Court on defendants Sheriff Kirk Taylor, Deputy Cindy Gomez, and Deputy Deana Cook's motion to dismiss [ECF No. 28] and defendants' motion to stay discovery [ECF No. 50]. Jurisdiction is proper pursuant to 28 U.S.C. §§ 1331 and 1367. For the reasons stated below, the motion to dismiss is granted. The motion to stay discovery is denied as moot.

## BACKGROUND

This claim arises out of the death of Ms. Tanya Martinez.  ECF No. 1 at ¶ 1.  Martinez

died on June 3, 2013 while she was housed at the Pueblo County Detention Facility (PCDF).

When she passed away, she was a pretrial detainee in the custody of the Pueblo County Sheriff's

Office (PCSO).  *Id.* at ¶¶ 1, 58.  Martinez died from "an alcohol withdrawal related seizure"

while she was in "lockdown" in a jail cell.  *Id.* at ¶ 1.  She was thirty-six years old.  *Id.*

<u>The Parties.</u>

Plaintiffs are Martinez's mother, Judy Armijo, who serves as the personal representative

of her estate and Martinez's two sons, Esai and Angel Martinez.  Esai Martinez is a minor, and

Armijo represents him.  *Id.* at ¶ 12–14.

Plaintiffs name a number of defendants.  Correctional Healthcare Companies, Inc. (CHC)

had a contract with Pueblo County to "provide medical services to inmates and detainees at the

PCDF[.]"  *Id.* at ¶ 16.  CHC. "supervised and implemented" the medical services.  *Id.*

Correctional Healthcare Physicians, P.C. provided "physician assistant services" to PCDF

inmates pursuant to a contract with defendant Norma Mower, PA-C.  *Id.* at ¶ 17.  In 2014 Correct

Care Solutions, LLC acquired CHC.  *Id.* at ¶ 18.  The Court will collectively refer to these

defendants as "CHC defendants."  At all relevant times, defendants Mike White, E.M.T.;

Jennifer Scott, R.N.; Kim Murray, L.P.N.; and Norma Mower, PA-C were employees of the

CHC defendants.  *Id.* at ¶¶ 24–27.

Defendant Sheriff Kirk Taylor is Pueblo County's sheriff and the "public figure

responsible for Pueblo County Sheriff's Department and the PCDF."  *Id.* at ¶ 21.  At all relevant

times, defendants Cindy Gomez, Deana Cook, and Annadene Lucero served as deputies at

PCDF.  *Id.* at ¶¶ 28–30.  The Court collectively refers to Deputies Gomez, Cook, and Lucero as "deputy defendants."

<u>Martinez's History of Alcohol Withdrawal.</u>

"Alcohol withdrawal is a medical condition that occurs when an alcoholic reduces or stops the consumption of alcohol."  *Id.* at ¶ 39.  Alcohol withdrawal is a "common condition that, when treated, rarely results in death[.]"  *Id.* at ¶ 45.  However, if it is "left untreated, or improperly treated . . . alcohol withdrawal can result in disastrous consequences, including seizures, strokes, and death."  *Id.* at ¶¶ 45, 46.

Martinez had a history of alcohol withdrawal.  ECF No. 1 at 10.  In May 2013 she was admitted to Parkview Medical Center for alcohol withdrawal.  *Id.* at ¶ 47.  On discharge from Parkview Medical Center, Martinez was diagnosed with "severe alcohol intoxication, alcoholic liver disease, and acute liver damage, and alcoholism."  *Id.* at ¶ 52.  Martinez also dealt with "severe alcohol withdrawals" during previous incarcerations at PCDF.  *Id.* at ¶ 54.  PCDF deputies, medical personnel, and other inmates were aware of her history of alcohol withdrawal.  *Id.* at ¶ 55.

<u>Events of June 2, 2013.</u>

On June 2, 2013 the Pueblo Police Department arrested Martinez and transported her to PCDF.  *Id.* at ¶¶ 56–57.  She was intoxicated, and Deputy Sheryld Lamas asked medical personnel to examine Martinez.  *Id.* at ¶¶ 59–60.  The initial medical screen occurred at 4:50 p.m., and Martinez stated "on the medical screen form that she had an alcohol problem."  *Id.* at ¶ 61.  She also indicated that she had "previously experienced a stroke, dizziness or fainting spells, heart trouble or chest pain, and that she had recently been hospitalized."  *Id.* at ¶ 61.  Nurse Kim

Murray took her vital signs, but she did not inquire about Martinez's recent hospitalization or alcoholism, and Nurse Murray "did not discuss alcohol withdrawal with Martinez." *Id.* at ¶ 64. At this time, Martinez was still drunk, so she had yet to begin displaying the symptoms of alcohol withdrawal. *Id.* at ¶ 63. Detention center personnel then placed Martinez in an intake cell. *Id.* at ¶ 66.

No medical staff monitored Martinez until 10:02 p.m. when Emergency Medical Technician (EMT) Michael White performed a second medical screen. *Id.* During EMT White's examination, Martinez "had an odor of alcohol on her breath and person." *Id.* at ¶ 66. EMT White took a second set of vitals, but because Martinez was still intoxicated, she had not started to show "acute withdrawal symptoms." *Id.* at ¶ 67. EMT White did not begin any alcohol withdrawal protocol.[1] *Id.* at ¶ 75. Rather, he concluded that Martinez could join the general prison population. *Id.* at ¶ 82. Therefore, Deputy Lamas conducted the booking process. *Id.* at ¶ 86. Martinez was given a "risk score" to determine where she should be housed. *Id.* at ¶ 87. Her score was "five," meaning "that she should have been housed in Dorm A," but Deputy Lamas placed her on the 3C Wing, which is a "lockdown" floor. *Id.* at ¶¶ 88, 89–90. On a lockdown floor, "inmates are locked in their cells," and there is less staff monitoring than in the dorms. *Id.* at ¶ 90.

Before being moved to the 3C Wing, Martinez was held in a cell in the intake area. *Id.* at ¶ 91. No medical staff checked on her while she was in the holding cell. *Id.* at ¶ 96. Deputy Gomez "periodically checked on" Martinez during her time in the holding cell, but she had no

---

[1] PCDF's alcohol withdrawal protocol involves giving an individual a number of supplements and medication, including "folic acid, prenatal vitamins, thiamine, vistaril, and the withdrawal medication Librium[.]" *Id.* at ¶ 77.

specific training caring for an individual suffering from alcohol withdrawal.  *Id.* at ¶¶ 92–93.

Martinez told Deputy Gomez about her recent hospitalization for alcohol withdrawal and that her

"liver levels" were heightened.  *Id.* at ¶ 94.  Martinez began to experience symptoms of alcohol

withdrawal, including shaking, while she remained in the holding cell.  *Id.* at ¶ 95.

Events of June 3, 2013.

Around 4:21 a.m. on June 3, 2013, Deputy Gomez moved Martinez to the 3C Wing.  *Id.*

at ¶ 97.  By that time, Martinez was displaying more significant symptoms, including nausea and

continued shaking.  *Id.*  Deputy Cook was in charge of the 3C Wing that morning.  *Id.* at ¶ 98.

Like Deputy Gomez, Deputy Cook did not have any targeted training on caring for a person

suffering from alcohol withdrawal.  *Id.* at ¶ 99.  Martinez asked Deputy Cook for her own cell

"in case she started throwing up."  *Id.* at ¶ 98.  Martinez also told Deputy Cook that she was

"withdrawing from alcohol."  *Id.*  Soon thereafter, Martinez began vomiting.  *Id.* at ¶ 100.  At

some time "well after" Martinez started to vomit and approximately three hours after Martinez

had been moved to the 3C Wing, Deputy Cook called medical to come check on Martinez.  *Id.* at

¶¶ 101, 102.

Nurse Jennifer Scott arrived at 7:20 a.m., shortly after Deputy Cook called for medical

assistance.  *Id.* at ¶ 103.  Nurse Scott took Martinez's vitals, which "were significantly elevated"

compared to her levels the night before.  *Id.* at ¶ 106.  Martinez's vital signs "revealed an

increasing severity of her withdrawal symptoms[.]"  *Id.* at ¶ 107.  In particular, her pulse rate was

quite elevated at a rate of 135 beats per minute.  *Id.* at ¶ 106.  Martinez told Nurse Scott that she

consumed a pint of liquor daily.  *Id.* at ¶ 109.  On "the Problem Oriented Record form," Nurse

Scott noted that Martinez "was tremulous, gastrointestinal, had tremors of hands, and was in withdrawal." *Id.* at ¶ 111.

Ten minutes later, at 7:30 a.m., Nurse Scott spoke with PA-C Mower about Martinez's status, and PA-C Mower ordered Nurse Scott to administer Librium to Martinez. *Id.* at ¶ 117. Computer paperwork from June 3, 2013 shows that Martinez received an anti-nausea medication at 7:47 a.m. *Id.* at ¶ 118 n.1. Plaintiffs state that it is unclear whether Nurse Scott did give Librium to Martinez, but if she did, she did not provide it until 9:46 a.m, which is when Nurse Scott returned. *Id.* ¶¶ 118 n.1; 124. The computer records from 9:46 a.m. show that Nurse Scott administered folic acid, thiamin, prenatal vitamin, and vistaril. *Id.* at ¶¶ 118, 127. Much later, computer records were produced to investigators that show that Nurse Scott did administer Librium. *Id.* at ¶ 118. Nurse Scott found Martinez shaking so badly that she could not hold a cup of water. *Id.* at ¶ 124. Nurse Scott did not take another set of vitals before leaving. *Id.*

Over the next five hours, no medical staff visited Martinez. *Id.* at ¶ 128. Her vomiting ceased, but she "continued to experience other severe withdrawal symptoms during this five-hour period." *Id.* at ¶ 129. She mostly remained on her cot and only got up to go to the bathroom. *Id.* At lunchtime, Deputy Cook helped Martinez unwrap her sandwich because Martinez's hands were still shaking. *Id.* at ¶ 130. Deputy Cook also stopped by Martinez's cell during her rounds to "make sure that [she] was still breathing." *Id.* at ¶ 131. Around 2:52 p.m., Nurse Scott gave Martinez another dose of Librium. *Id.* at ¶ 136. Nurse Scott was with Martinez for "less than one minute[,]" and she did not take her vitals. *Id.* at ¶ 137.

At approximately 3:00 p.m., Deputy Lucero took over Deputy Cook's shift. *Id.* at ¶ 143. At that time, Martinez was still experiencing symptoms of withdrawal, and she had been

"shaking for at least eleven hours." *Id.* at ¶ 144.  Deputy Cook told Deputy Lucero that Martinez

had made frequent visits to the bathroom that day to vomit. *Id.* at ¶ 145.  Martinez informed

Deputy Lucero that she drank half a large bottle of liquor every day, and that she was

experiencing bad alcohol withdrawal. *Id.* at ¶¶ 146–47.  Deputy Lucero let Martinez use the

restroom several times, and when Martinez got up to travel to the bathroom, she was "breathing

hard," and the trip to the bathroom was "exhausting." *Id.* at ¶ 148.

Deputy Lucero observed that Martinez's hands began to cramp up, which Martinez

described as "lobster hands" because they were "twisted and contorted." *Id.* at ¶¶ 149–50.

Deputy Lucero then called medical to come to 3C Wing. *Id.* at ¶ 151.  She believed that

Martinez was dehydrated and encouraged her to drink water. *Id.* at ¶ 152.  After radioing

medical, Deputy Lucero locked Martinez back in her cell. *Id.* at ¶ 155.

Nurse Scott responded to the radio call but said that she "was busy checking blood sugar

levels of other inmates[.]" *Id.* at ¶ 156.  She asked if another medical staffer could respond to the

medical call. *Id.*  Nurse Murray replied over the radio, and she said that she would respond. *Id.*

at ¶ 157.  However, Nurse Murray first called the third-floor control room to inquire about which

inmate needed to be checked. *Id.* at ¶ 158.  The control room operator did not know Martinez's

name. *Id.*  Nurse Murray decided that she did not need to follow up on the radio call about an

inmate in the 3C Wing. *Id.* at ¶ 159.  No one came to check on Martinez. *Id.* at ¶ 160.

Fifteen or twenty minutes after Deputy Lucero called for medical, Deputies Lucero and

Janese Dickenson began to serve dinner. *Id.* at ¶ 167.  When Deputy Lucero unlocked

Martinez's cell to serve her dinner, Martinez was unresponsive on her cot. *Id.* at ¶ 170.  She

"was not breathing, had no pulse, and a trickle of blood was coming out of the side of her

mouth." *Id.*  Martinez "was already cyanotic and blue in the face." *Id.*  Deputy Lucero radioed a "code one," and Nurses Scott and Murray and EMT Steve Halloway responded quickly. *Id.* They attempted cardiopulmonary resuscitation and used an Automatic External Defibrillator to no avail. *Id.* at ¶ 172.  Martinez was pronounced dead at 5:37 p.m. *Id.* at ¶ 173.  Her official cause of death was "an alcohol withdrawal-related seizure." *Id.* at ¶ 175.

<u>Procedural History.</u>

Plaintiffs filed this lawsuit on June 1, 2015, alleging violations of Martinez's constitutional rights pursuant to 42 U.S.C. § 1983 and raising other state claims.  ECF No. 1. They allege that Martinez's death was "preventable," and that she died "because of Defendants' deliberate indifference to her medical needs [], and other negligent conduct." *Id.* at ¶ 2.

Defendants filed a motion to dismiss on August 7, 2015.  ECF No. 28.  The parties subsequently stipulated to the dismissal of plaintiffs' Third Claim (deprivation of life without due process) against all defendants.  ECF No. 29 at 2.  At the same time, the parties also stipulated to the dismissal of three of plaintiffs' claims as against Deputies Gomez, Cook, and Lucero: (1) Claim Five (negligence); (2) Claim Seven (wrongful death pursuant to C.R.S. § 13–21–202); and (3) Claim Eight (survival). *Id.*  On November 24, 2015, the parties stipulated to the dismissal of original defendant Board of County Commissioners of Pueblo County, Colorado.  ECF No. 49.

## DISCUSSION

### I.    Standard of Review

To survive a 12(b)(6) motion to dismiss, the complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Ridge at Red Hawk, L.L.C. v. Schneider*, 493

F.3d 1174, 1177 (10th Cir. 2007) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  While the Court must accept the well-pleaded allegations of the complaint as true and construe them in the light most favorable to the plaintiff, *Robbins v. Wilkie*, 300 F.3d 1208, 1210 (10th Cir. 2002), purely conclusory allegations are not entitled to be presumed true.  *Ashcroft v. Iqbal*, 556 U.S. 662, 681 (2009).  However, so long as the plaintiff offers sufficient factual allegations such that the right to relief is raised above the speculative level, he has met the threshold pleading standard.  *See, e.g.*, *Twombly*, 550 U.S. at 556; *Bryson v. Gonzales*, 534 F.3d 1282, 1286 (10th Cir. 2008).  Importantly, "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely."  *Twombly*, 550 U.S. at 556 (internal quotation marks omitted); *accord Robbins v. Okla. ex. rel. Dep't of Human Servs.*, 519 F.3d 1242, 1247 (10th Cir. 2008).  "The court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted."  *Sutton v. Utah State Sch. for the Deaf & Blind*, 173 F.3d 1226, 1236 (10th Cir.1999) (internal citation omitted).

## II.       Motion to Dismiss.

Plaintiffs assert a sole claim against the deputy defendants: pursuant to 42 U.S.C. § 1983, plaintiffs allege that Deputies Gomez, Cook, and Lucero violated Martinez's "clearly established right under the Fourteenth Amendment to the U.S. Constitution to be free from deliberate indifference to her known serious medical needs."  ECF No. 1 at ¶¶ 222–26.  Plaintiffs bring six claims against Sheriff Taylor in his official capacity: Claim Two for a violation of the Fourteenth Amendment by failing to provide medical care; Claim Four for medical negligence; Claim Five

for negligence; Claim Six for negligent training and supervision; Claim Seven for wrongful

death pursuant to C.R.S. § 13–21–202; and Claim Eight for survival.  The deputy defendants and

Sheriff Taylor seek the dismissal of the claims against them for failure to state a claim on which

relief could be granted and on qualified immunity grounds.  ECF No. 28 at 9.

**A. Claim One – Deputy Defendants' Failure to Provide Medical Care and Treatment.**

The qualified immunity doctrine "shields government officials performing discretionary

functions from liability for damages insofar as their conduct does not violate clearly established

statutory or constitutional rights of which a reasonable person would have known." *Toevs v.

Reid*, 685 F.3d 903, 909 (10th Cir. 2012) (internal quotations and citations omitted).  By

asserting qualified immunity, a defendant "trigger[s] a well-settled twofold burden" that the

plaintiff is "compelled to shoulder." *Cox v. Glanz*, 800 F.3d 1231, 1245 (10th Cir. 2015).  The

burden shifts to the plaintiff to show (1) "that the defendant's actions violated a specific statutory

or constitutional right," and (2) that the right was "clearly established at the time of the conduct

at issue." *Steffey*, 461 F.3d at 1221.  Courts have discretion to address either prong of this

standard first. *Cox*, 800 F.3d at 1246.

The relevant constitutional issue here is a prisoner's right to adequate medical care for

serious medical needs.  Prisoners, because of their confinement, cannot provide for their own

medical care.  "[T]he treatment a prisoner receives in prison and the conditions under which he is

confined are subject to scrutiny under the Eighth Amendment."[2] *Farmer v. Brennan*, 511 U.S.

---

[2] Because Martinez was a pretrial detainee at the time of her death, her constitutional claim arises under the Due Process Clause of the Fourteenth Amendment, which affords "the same degree of protection against denial of medical care as that afforded to convicted inmates under the Eighth Amendment." *Estate of Hocker ex rel. Hocker v. Walsh*, 22 F.3d 995, 998 (10th Cir. 1994).  The Eighth Amendment

825, 832 (1994).  The Supreme Court has held that the Eighth Amendment prohibits "unnecessary and wanton infliction of pain," including "deliberate indifference to serious medical needs of prisoners."  *Estelle v. Gamble*, 429 U.S. 97, 104 (1976).

The test for deliberate indifference requires the satisfaction of both an objective and subjective component.  *Mata v. Saiz*, 427 F.3d 745, 751 (10th Cir. 2005) (internal quotations and citations omitted).  First, the objective component requires that the prisoner "produce objective evidence that the deprivation at issue was in fact 'sufficiently serious.'"  *Id*.  A medical need is sufficiently serious if "it is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention."  *Id.*  A delay in medical care "only constitutes an Eighth Amendment violation where the plaintiff can show that the delay resulted in substantial harm."  *Oxendine v. Kaplan*, 241 F.3d 1272, 1276 (10th Cir. 2001).  Second, the subjective component is satisfied when a prison official has a culpable mind, meaning that the official "knows of and disregards an excessive risk to inmate health or safety."  *Id.*  The Tenth Circuit has emphasized that "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.  Deliberate indifference requires more than mere negligence."  *Sealock v. Colorado*, 218 F.3d 1205, 1211 (10th Cir. 2000).

Additionally, "[i]ndividual liability under § 1983 must be based on personal involvement in the alleged constitutional violation."  *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 768 (10th Cir. 2013) (internal citation omitted).  "A plaintiff must show that an affirmative link exists between the constitutional deprivation and either the defendant's personal

---

governs the analytic framework for a claim for deliberate indifference to medical needs.  *Lopez v. LeMaster*, 172 F.3d 756, 759 n. 2 (10th Cir. 1999).

participation, his exercise of control or direction, or his failure to supervise." *Ledbetter v. City of Topeka*, 318 F.3d 1183, 1187 (10th Cir. 2003) (internal citations and quotations omitted).  For the purposes of the present motion, the Court will assume that plaintiffs sufficiently allege that there is an "affirmative link" between each deputy defendant's conduct and the constitutional deprivation even though the deputies' roles in the events leading to Martinez's death were limited.  Defendants do not raise this issue in the motion to dismiss.

For the purpose of this motion, the Court also assumes that the deprivation in question was sufficiently serious to meet the objective prong of the deliberate indifference test.  Obviously death constitutes a serious harm.  Additionally, plaintiffs offer numerous objective facts about the dangerous symptoms and effects of alcohol withdrawal.  Defendants concede this point.  ECF No. 41 at 52.

The remaining question then is whether plaintiffs have plausibly alleged that the deputy defendants possessed the requisite mental culpability to satisfy the subjective component of deliberate indifference.  The subjective component is "akin to recklessness in the criminal law, where, to act recklessly, a person must consciously disregard a substantial risk of serious harm." *Self v. Crum*, 439 F.3d 1227, 1231 (10th Cir. 2006) (internal citations and quotations omitted).  The subjective component "presents a high evidentiary hurdle to the plaintiffs: a prison official must know about and disregard a substantial risk of serious harm. . . . A claim is therefore actionable only in cases where the need for additional treatment or referral to a medical specialist is obvious." *Id.* at 1232.  Deliberate indifference is characterized by "obduracy and wantonness." *Whitley v. Albers*, 475 U.S. 312, 319 (1986).  A prison official acts with deliberate indifference "only if he knows that inmates face substantial risk of serious harm and disregards

that risk by failing to take reasonable measures to abate it." *Farmer*, 511 U.S. at 847. However, "an inadvertent failure to provide medical care does not rise to a constitutional violation." *Martinez v. Beggs,* 563 F.3d 1082, 1088 (10th Cir. 2009) (internal quotations and citations omitted).

In *Mata*, the Tenth Circuit held that a prison official who acts "solely . . . as a gatekeeper for other medical personnel capable of treating the condition may be held liable under the deliberate indifference standard if she delays or refuses to fulfill that gatekeeper role." 427 F.3d 745, 751 (10th Cir.2005) (internal quotations and citation omitted). But the gatekeeper theory does not entirely eliminate the subjective component of deliberate indifference. A prison official can be liable if the prison official "knows that [her] role in a particular medical emergency is solely to serve as a gatekeeper for other medical personnel capable of treating the condition, and if [she] delays or refuses to fulfill that . . . role due to deliberate indifference." *Sealock*, 218 F.3d at 1211. The *Mata* panel reasoned that,

> What is significant is that the evidence presented to the district court supports the conclusion that [the nurse] was in fact aware Ms. Mata was suffering from severe chest pains and required medical attention. Ms. Mata personally reported as much to [the nurse].

427 F.3d at 756. After *Mata,* the Tenth Circuit clarified that in order to establish "gatekeeper liability," a plaintiff must still allege that the need for medical care was "obvious" to the prison official. *Self*, 439 F.3d at 1232.

Plaintiffs make multiple claims about all three deputy defendants. They attest that each deputy defendant "knew or should have known that Ms. Martinez was experiencing severe alcohol withdrawal, or at least bore a high risk therefor, and the deleterious consequences of not properly treating that medical condition." ECF No. 1 at ¶ 225. Additionally, plaintiffs allege

that despite the deputy defendants' "knowledge of [Martinez's] serious medical needs," they acted with deliberate indifference by failing to "properly examine, monitor, treat, and care" for Martinez. *Id.* at ¶ 226. Plaintiffs claim that all deputy defendants failed to follow prison policy that provides that inmates displaying "acute withdrawal symptoms" should be taken to an observation unit. *Id.* at ¶ 113. Additionally, plaintiffs argue that the Court should consider the failure to follow department policy as "strong circumstantial evidence" that the prison officials "knew of and disregarded a substantial risk of serious harm." ECF No. 38 at 10. Finally, plaintiffs argue that the subjective component of deliberate indifference can be satisfied through "showing that a delay in treatment caused either unnecessary pain or worsening of [Martinez's] condition." *Id.*

The Court proceeds by considering plaintiffs' allegations as they apply to each deputy.

**1. Deputy Gomez.**

Plaintiffs' allegations regarding Deputy Gomez relate to the time that Martinez was in the holding cell before she was moved to 3C Wing. *Id.* at ¶ 92–97. Plaintiffs' claim against Deputy Gomez is not one of delay. Rather, plaintiffs allege that Deputy Gomez failed to contact medical personnel to check on Martinez altogether. *Id.* at ¶ 96. Deputy Gomez "periodically checked on Ms. Martinez" while she was in the holding cell. *Id.* at ¶ 92. Plaintiffs allege that Martinez told her about her hospitalization in May 2013 for alcohol withdrawal and also informed Deputy Gomez that her liver levels were really elevated. *Id.* at ¶ 94. Plaintiffs also attest that Martinez began to exhibit symptoms while in the holding cell, and that she was shaking and experiencing nausea by the time Deputy Gomez took her to 3C Wing. *Id.* at ¶¶ 95, 97.

Even when taking these allegations as true, plaintiffs fail to plausibly allege that Deputy Gomez not only knew that Martinez was suffering from alcohol withdrawal but that she actually drew the inference that a "substantial risk of serious harm exists."  Plaintiffs point to Martinez's informing Deputy Gomez of her hospitalization and liver levels as evidence that Deputy Gomez subjectively knew of the risk of alcohol withdrawal and consciously disregarded it.  They rely on the conclusory statement that Martinez's relaying this information to Deputy Gomez "provided further evidence that Ms. Martinez suffered from alcoholism and needed to be treated aggressively."  *Id.* at ¶ 94.  What is missing is a factual allegation that makes plausible the conclusory allegations about conscious disregard and knowledge that Ms. Martinez needed aggressive medical treatment at that time.

Similarly, plaintiffs suggest that Deputy Gomez was aware of Martinez's "obvious symptoms" because Martinez was shaking and experiencing nausea by the time Deputy Gomez took her to the 3C Wing.  However, there are no specific allegations that Deputy Gomez actually took note of the symptoms, and even if she did, that she drew the inference that Martinez's symptoms demonstrated that she was, at that time, in serious danger.  In sum, plaintiffs' Complaint is devoid of specific facts from which the Court could infer that Deputy Gomez was deliberately indifferent to a serious medical need that Ms. Martinez was experiencing when the deputy saw her.

**2. Deputy Cook.**

When Martinez arrived on 3C Wing where Deputy Cook was in charge, her condition began to worsen.  *Id.* at ¶ 100.  Martinez informed Deputy Cook that she was suffering from alcohol withdrawal and requested a private cell in case she began to vomit.  *Id.* at ¶ 98.  Soon,

Martinez did vomit and started to show more pronounced symptoms. *Id.* at ¶ 100. Plaintiffs claim that, despite the fact that Martinez was having "obvious symptoms" of alcohol withdrawal, Deputy Cook only called for medical help once, and that was after three hours or more had passed. *Id.* at ¶ 102. Nurse Scott responded to the call and examined Martinez at 7:20 a.m. *Id.* at ¶¶ 102, 106. At lunchtime Deputy Cook assisted Martinez with unwrapping her sandwich because her hands were shaking. *Id.* at ¶ 130. Deputy Cook also periodically checked on Martinez to determine if she "was still breathing." *Id.* at ¶ 131. During this time, other inmates noticed that Martinez was visibly sweating, shaking "uncontrollably," and looked "really bad." *Id.* at ¶ 133. Nurse Scott returned at 2:52 p.m. to give Martinez some Librium, but Nurse Scott "did not instruct Deputy Cook to pay careful attention to Ms. Martinez." *Id.* at ¶ 139.

No facts are alleged that plausibly suggest that Deputy Cook consciously disregarded a serious risk to Martinez's health during the initial three hours. She did summon a nurse, and plaintiffs do not allege facts suggesting that Deputy Cook had reason to disagree with the nurse's assessment of the situation. The nurse returned, and again, there are no factual allegations suggesting that Deputy Cook had reason to challenge the nurse's assessment. That is why there are medical personnel stationed in the jail. In sum, plaintiffs fail to offer specific facts to make it plausible that Deputy Cook consciously disregarded a serious risk.

### 3. **Deputy Lucero.**

When Deputy Lucero relieved Deputy Cook around 3:00 p.m. on June 3, Deputy Cook informed her that Martinez had been vomiting throughout the day. *Id.* at ¶¶ 143, 145. Martinez told Deputy Lucero that she consumed "half a big bottle of vodka" daily, and that she was "very sick from alcohol withdrawal." *Id.* at ¶¶ 146, 147. Deputy Lucero let Martinez out of her cell a

number of times to go to the bathroom, and Martinez was "breathing hard" when she got up to travel to the restroom.  *Id.* at ¶ 148.  Plaintiffs allege that Deputy Lucero personally observed Martinez's severe symptoms, including her cramping and "contorted" hands.  *Id.* at ¶ 151.  It was only then that Deputy Lucero called for medical attention.  *Id.*  Deputy Lucero "opined" that Martinez was "simply dehydrated and advised her to drink water."  *Id.* at ¶ 152.  Plaintiffs allege that Deputy Lucero locked Martinez in her cell despite her urgent need for medical attention.  *Id.* at ¶ 145.  Deputy Lucero did not check on Martinez for the 15 or 20 minutes between when Deputy Lucero called medical and when Martinez died.  *Id.* at ¶ 168.

Plaintiffs' Complaint is devoid of facts that make it plausible that Deputy Lucero actually drew the inference that Martinez was in serious danger.  For example, plaintiffs allege that her "contorted hands and difficulty breathing were additional signs . . . that she badly needed medical treatment."  *Id.* at ¶ 152.  However, plaintiffs do not allege that Deputy Lucero actually made this connection.  In fact, according to plaintiffs' version of the facts, at the time she called medical, it was Deputy Lucero's opinion that Martinez was merely dehydrated.  *See Self*, 439 F.3d at 1232 (holding that a claim for gatekeeper liability is actionable "where the need for additional treatment [] is obvious").  Regardless, Deputy Lucero summoned medical personnel.  There is no indication that she was in any way responsible for the 15 to 20 minute delay in medical's response or that it was obvious to Deputy Lucero that Ms. Martinez  was in such dire straits that she could not wait for 15 or 20 minutes for medical to arrive.  Plaintiffs fail to allege that Deputy Lucero's conduct rises to the level of wanton or reckless disregard for Martinez's health.

In sum, even taking plaintiffs' well-pled factual allegations as true and construing inferences in their favor, the Court concludes that they do not plausibly establish that the deputies were deliberately indifferent in failing to perform their gatekeeper role.  Perhaps the allegations as to one or more of them might survive a motion to dismiss a negligence claim, but they do not meet the more demanding constitutional violation standard.  Therefore, the Court dismisses Claim One as against the three deputies.  As such, the Court need not reach the remainder of the qualified immunity analysis.

### B.  Claim Two – Sheriff Taylor's Failure to Provide Medical Care and Treatment.

In contrast to their state counterparts, county officials may be sued in their official capacity.  *Meade v. Grubbs*, 841 F.2d 1512, 1529 (10th Cir. 1988).  Colorado law provides that sheriffs have the "authority and responsibility to oversee county jails."  *Estate of Began v. Lake County, Colorado Sheriff's Office*, 2008 WL 2690702, at *6 (D. Colo. 2008) (citing C.R.S. § 30–10–511).  Some courts have considered a sheriff's acts as representative of official policy because a sheriff typically assumes the role of the "final policymaker" in charge of the operations of a county jail.  *See, e.g.*, *Cortese v. Black*, 838 F.Supp. 485, 496 (D. Colo. 1993).  In essence, a suit against a sheriff in his official capacity is an action against the entity that employs him—here, Pueblo County.  *Pietrowski v. Town of Dibble*, 134 F.3d 1006, 1009 (10th Cir. 1998) (internal citation omitted).

In order to state a claim for municipal liability, a plaintiff must allege the existence of (1) an official policy or custom; (2) a direct causal link between the policy or custom and the constitutional injury alleged; and (3) deliberate indifference on the part of the municipality.  *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 769 (10th Cir. 2013) (a plaintiff

must "show that the policy was enacted or maintained with deliberate indifference to an almost inevitable constitutional injury"). The "official policy or custom" requirement "was intended to distinguish acts of the *municipality* from acts of *employees* of the municipality, and thereby make clear that municipal liability is limited to action for which the municipality is actually responsible." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479 (1986) (emphasis in original). A plaintiff may allege the existence of a municipal policy or custom in the form of (1) an officially promulgated policy; (2) an informal custom amounting to a widespread practice; (3) the decisions of employees with final policymaking authority; (4) the ratification by final policymakers of the decisions of their subordinates; or (5) the failure to adequately train or supervise employees. *Bryson v. City of Oklahoma City*, 627 F.3d 784, 788 (10th Cir. 2010).

Plaintiff must also allege a direct causal link between the municipal policy and the injury alleged. *Bd. of Cty. Comm'rs of Bryan Cty., Okl. v. Brown*, 520 U.S. 397, 404 (1997). That is, the municipality must be the "direct cause" or "moving force" behind the constitutional violation. *Smedley v. Corr. Corp. of Am.*, 175 F. App'x 943, 946 (10th Cir. 2005); *City of Canton, Ohio v. Harris*, 489 U.S. 378, 385 (1989) ("It is only when the 'execution of the government's policy or custom . . . inflicts the injury' that the municipality may be held liable under § 1983."). Furthermore, "where the policy relied upon is not itself unconstitutional, considerably more proof than the single incident will be necessary in every case to establish both the requisite fault on the part of the municipality, and the causal connection between the 'policy' and the constitutional deprivation." *City of Okla. City v. Tuttle,* 471 U.S. 808, 824 (1985).

Finally, plaintiff must allege the requisite degree of culpability on the part of the county. *Schneider*, 717 F.3d at 769. "[T]he prevailing state-of-mind standard for a municipality is

deliberate indifference regardless of the nature of the underlying constitutional violation." *Id.* at 771 n.5.  Further,

> The deliberate indifference standard may be satisfied when the municipality has actual or constructive notice that its action or failure to act is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm.  In most instances, notice can be established by proving the existence of a pattern of tortious conduct.  In a narrow range of circumstances, however, deliberate indifference may be found absent a pattern of unconstitutional behavior if a violation of federal rights is a highly predictable or plainly obvious consequence of a municipality's action or inaction[.]

*Id.* at 771 (quoting *Barney v. Pulsipher*, 143 F.3d 1299, 1307 (10th Cir. 1998)).  Deliberate indifference for municipal liability purposes—in contrast to the analysis under the Eighth Amendment—is evaluated from an objective standpoint.  *Barney,* 143 F.3d at 1308 n.5.

Regarding medical care specifically, a county can be liable indirectly through the non-delegable duty doctrine.  The state's duty to provide adequate medical care is non-delegable. "Contracting out prison medical care does not relieve the State of its constitutional duty to provide adequate medical treatment to those in its custody, and it does not deprive the State's prisoners of the means to vindicate their Eighth Amendment rights."  *West v. Atkins*, 487 U.S. 42, 56 (1988); *see also Nieto v. Kapoor*, 268 F.3d 1208, 1216 (10th Cir. 2001). "[T]he State cannot, by choosing to delegate its constitutional duties to the professional judgment of others, thereby avoid all liability flowing from the attempted fulfillment of those duties under Section 1983."  *Anglin v. City of Aspen, Colo.*, 552 F.Supp.2d 1229, 1244 (D. Colo. 2008) (citing *West*, 487 U.S. at 56 n.14).  Simply put, "if a local government delegates final policy-making authority to a particular employee, any custom or policy created by that employee is the custom or policy of the local government as well."  *Herrera v. Cnty. of Santa Fe*, 213 F.Supp.2d 1288, 1292 (D. N.M. 2002).

Even if the Court were to find that plaintiffs sufficiently allege the first two components of a municipal liability claim—the existence of an official policy or custom and causation—their claim must fail because no facts are alleged that plausibly suggest that Sheriff Taylor possessed the requisite culpable mind.[3]  Therefore, the Court finds that plaintiffs have not stated a constitutional claim against Sheriff Taylor.

Plaintiffs argue that CHC has a "long history" of providing inadequate medical care in various prisons.  *Id.* at ¶ 199.  They list numerous examples from facilities in Colorado and across the country to show that "CHC Defendants and the counties that employ them are deliberately indifferent in their policies, customs, and practices with respect to the medical needs of inmates."  *Id.* at ¶¶ 199; 201–219.  Additionally, plaintiffs describe multiple investigations, audits, and reviews conducted by various governmental entities into the adequacy of medical care provided by CHC-related companies.  *Id.* at ¶¶ 210–216.  While none of these incidents or investigations occurred in Pueblo County, plaintiffs allege that, had Sheriff Taylor engaged in "any kind of due diligence before contracting with CHC-related companies," he would have known of these "serious issues."  *Id.* at ¶ 217.  They further attest that Sheriff Taylor "had all of the above-described knowledge and notice" prior to Martinez's death which was "the result of

---

[3] In claiming that PCDF and CHC had policies or customs that led to the alleged constitutional deprivation, plaintiffs attest that Pueblo County's contract with the CHC defendants created financial incentives that resulted in deficient care.  ECF No. 1 at ¶ 180.  In *McGill v. Correctional Healthcare Companies, Inc.*, No. 13-cv-1080-RBJ-BNB, 2014 WL 2922635, at *8 (D. Colo. June 27, 2014), this Court found allegations about the incentives created by a contract with CHC to be sufficient—albeit barely—at the motion to dismiss stage.  Plaintiffs argue that the allegations in *McGill* and those here are "nearly identical[.]" ECF No. 38 at 11.  I disagree.  Here, plaintiffs rely on conclusory statements about how the contract created the alleged incentives without providing factual support.  *See* ECF No. 1 at ¶¶ 180, 181, 236.  In contrast, the *McGill* complaint included specific details from the contract to support the allegation that incentives did exist, and that they plausibly discouraged the imposition of sanctions for the provision of improper care and the hospitalization of inmates requiring emergent care.  *See* First Amend. Compl., Case No. 13-cv-01080-RBJ-BNB, ECF No. 42 at ¶¶ 202, 203, 204, 236 and 237.

longstanding, systemic deficiencies in the medical care provided to inmates by CHC[.]"  *Id.* at ¶ 218.

Essentially, plaintiffs' allegations suggest that Sheriff Taylor knew or should have known of the risk of contracting with CHC.  I agree with defendants that this is too "tenuous" to state a municipal liability claim.  ECF No. 28 at 11–12.  The Court recognizes that a sheriff should conduct some amount of due diligence before entering into a contract for the provision of medical care.  However, plaintiffs' allegations about Sheriff Taylor's deliberate indifference are too conclusory to survive dismissal.  Plaintiffs fail to offer additional factual support that, even if he had actual or constructive knowledge of CHC's troubling past, Sheriff Taylor would have then been "on notice" that contracting with the CHC defendants was "substantially certain to result in a constitutional violation" at PCDF.  *See Schneider*, 717 F.3d at 771.

In sum, by failing to sufficiently allege Sheriff Taylor's deliberate indifference, plaintiffs fail to state a constitutional claim against Sheriff Taylor in his official capacity.

### III.     State Law Claims

Sheriff Taylor moves for dismissal of the remaining five state law claims against him. *See* ECF No. 28 at 12–16.  Plaintiffs bring these claims against the Sheriff in his official capacity for medical negligence, negligence, negligent training and supervision, wrongful death under C.R.S. § 13–21–202, and survival.  *See* ECF No. 1 at 37–44.

 "Seeking to vindicate values of economy, convenience, fairness, and comity underlying the judicially-created doctrine of pendent jurisdiction, Congress granted statutory authority to district courts to hear claims that form 'part of the same case or controversy' as the claims on which original federal jurisdiction is based."  *Estate of Harshman v. Jackson Hole Mountain*

*Resort Corp.*, 379 F.3d 1161, 1164 (10th Cir. 2004) (citing 28 U.S.C. § 1367). In addition to providing supplemental jurisdiction, § 1367 also provides that a district court may decline to exercise supplemental jurisdiction where "the district court has dismissed all claims over which it has original jurisdiction." § 1367(c)(3). Additionally, the "Supreme Court repeatedly has determined that supplemental jurisdiction is not a matter of the litigants' right, but of judicial discretion." *Estate of Harshman,* 349 F.3d at 1165 (internal citation omitted). Because I am dismissing Claims One and Two, there are no remaining federal questions. There is no diversity of citizenship between the parties. Therefore, no alternative basis for federal jurisdiction exists, and I decline to exercise supplemental jurisdiction over the remaining state law claims.

### IV.    Motion to Stay Discovery.

On March 2, 2016, Sheriff Taylor and the deputy defendants filed a motion to stay discovery. ECF No. 50. Defendants claim that the Court should exercise its discretion in staying discovery while this motion to dismiss is pending. *Id.* at 3. Because the Court decides the motion to dismiss in the present order, the motion to stay discovery is moot.

### ORDER

For the reasons stated above, the motion to dismiss [ECF No. 28] is GRANTED as to the federal law claims against defendants Deputy Lucero, Deputy Cook, Deputy Gomez, and Sheriff Taylor. The motion to stay discovery [ECF No. 50] is DENIED as MOOT.

DATED this 31st day of March, 2016.

BY THE COURT:

_____

R. Brooke Jackson
United States District Judge